KAREN P. HEWITT
United States Attorney
CHRISTINA M. McCALL
Assistant U.S. Attorney
California State Bar No. 234139
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Phone: (619) 557-6760
Fax: (619) 235-2757
E-mail: christina.mccall@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ESMERALDA PICAZO (1),<br>MANUEL ZAMORA-FLORES (2),<br>ALBERTO LOPEZ-MARTINEZ (3)<br><br>Defendants. | Criminal Case No. 08CR1555-BEN<br><br>**RESPONSE AND OPPOSITION TO DEFENDANTS' MOTIONS:**<br><br>(1) TO COMPEL SPECIFIC DISCOVERY<br>(2) DISCLOSE CONFIDENTIAL INFORMANT<br>(3) VOIR DIRE<br>(4) PRESERVE EVIDENCE<br>(5) REVIEW PERSONNEL FILES<br>(6) NOTICE OF EVIDENCE<br>(7) SEVERANCE<br>(8) SUPPRESS EVIDENCE<br>(9) SUPPRESS STATEMENTS<br><br>Date: August 6, 2008<br>Time: 9:30 a.m.<br>Court: The Hon. Rober T. Benitez |

Plaintiff, UNITED STATES OF AMERICA, by and through its counsel, United States Attorney, Karen P. Hewitt, and Assistant U.S. Attorney Christina M. McCall, hereby files its Response and Opposition to Defendants' Motions. This Response and Opposition is based upon the files and records of this case, together with the attached Statement of Facts, Memorandum of Points and Authorities, as well as the Government's Motion for Reciprocal Discovery.

/ /

## I

## STATEMENT OF FACTS

**A. Arrest of Defendants**

On April 30, 2008, Senior Border Patrol Agent Christopher Bush was working near Pine Valley, California. This area is located in a remote mountainous region about 45 miles east of San Diego, 8 miles east of the Tecate port of entry, and 12 miles north of the international border. This area includes a number of well-known alien smuggling loading, drop-off and checkpoint circumvention routes.

At around 8:15 p.m., Agent Bush watched a maroon Lincoln Navigator exit the eastbound lanes of Interstate 8 at Pine Valley Road, then immediately re-enter the westbound lanes of Interstate 8. Agent Bush conducted moving surveillance on the Navigator as it traveled west, then saw it exit Interstate 8 at Highway 79, then immediately re-enter Interstate 8 eastbound. Agent Bush knew that smugglers frequently make multiple loops around a given location when they are attempting to pick up illegal aliens or drop off drivers at pre-determined locations where smuggling vehicles await.

Agent Bush watched the Navigator pull over to the side of Interstate 8 at the Corte Madera Road Bridge, behind a grey Dodge pickup truck. The pickup truck was registered to Marselino Picazo from Chula Vista. Agent Bush watched a man exit the Navigator and climb into the driver's side door of the pickup truck. Agent Bush noted that Chula Vista was many miles away from Pine Valley, and knew that smugglers frequently leave vehicles parked on the highway to simulate abandoned vehicles in order to deceive law enforcement officers.

Agent Bush notified other members of his plainclothes unit, who positioned themselves on the westbound lanes of Interstate 8 near the east end of the Pine Valley Creek Bridge, which is a notorious area for loading illegal aliens into vehicles.

About five minutes after Agent Bush called for backup, Agent Francisco Rivera saw the Navigator and grey pickup that Agent Bush had described traveling in tandem on Interstate 8, approaching Highway 79. When the vehicles approached Willows Road, the Navigator slowed its speed and attempted to impede the marked Border Patrol sedan from getting behind the

pickup truck. Agent Benjamin Blanchard, who was driving the marked Border Patrol sedan, was able to view the license plate on the Navigator, which came back registered to Nicholas Ricardo Picazo from Chula Vista. As Agent Blanchard passed the pickup, he was able to look inside and see the driver and the front-seat passenger. Agents Blanchard and Hiram Cuevas maintained surveillance on the Navigator as it continued west on Interstate 8.

At about 8:30 p.m., when the pickup truck was nearly past the Willows Road exit, the driver of the pickup truck abruptly merged against traffic from the fast lane and exited at Willows Road. Agents interpreted this erratic driving as an attempt to elude the marked Border Patrol sedan. The pickup truck then rapidly accelerated and turned westbound onto Alpine Boulevard. At this point, Agent Bush activated his emergency lights and siren to warn the public about the pickup truck's dangerous driving. The pickup truck sped away from Agent Bush and began passing over a double yellow line. Agent Bush saw the pickup truck turn left onto Bay Terrace Road. When Agent Bush turned onto Bay Terrace, he saw the pickup truck stationary. Several people exited the bed of the pickup truck and ran into the surrounding brush.

After a short foot chase, Agent Bush apprehended six people. In a different direction, Supervisory Border Patrol Agent Jeffrey Dinise was able to apprehend a single individual identified as Defendant 3, Alberto Lopez-Martinez, also known as Carlos Gobea-Lopez. During a field interview, each of the six individuals, including Lopez-Martinez/Gobea-Lopez, admitted being citizens of Mexico illegally present in the United States. Agents arrested and transported all six people to the El Cajon station for processing. The pickup truck could not be driven as a result of the reckless driving and was towed from the scene.

At approximately 8:35 p.m., Agent Blanchard, in his marked patrol car, began a vehicle stop for the Lincoln Navigator. The Navigator pulled to a stop at the Tavern Road exit off of Interstate 8. The driver was Defendant 1, Esmeralda Picazo and the front-seat passenger was Defendant 2, Manuel Zamora-Flores. The Navigator also contained Picazo's mother--Mercedes Picazo, father--Marcelino Picazo, and daughter. Marcelino Picazo was the registered owner of the grey pickup truck that contained the six illegal aliens. All the occupants of the Navigator

were transported to the El Cajon station. Picazo's parents and daughter were released, but Picazo, Zamora and Lopez-Martinez were arrested for alien smuggling.

**B. Processing of Defendants**

At the station, Agent Blanchard was unable to recognize the driver of the pickup truck from the assembled group of individuals. However, Agent Blanchard did recognize Lopez-Martinez as the front-seat passenger in the pickup truck.

A criminal history check revealed that Picazo had been arrested twice for alien smuggling through the San Ysidro port of entry. Subsequent investigation revealed a third arrest for alien smuggling. At the time that Zamora's criminal history was run at the station, there were no arrests noted. However, subsequent investigation revealed that Zamora was arrested on January 25, 2001 at the San Ysidro port of entry as the driver of a pickup truck carrying a Mexican citizen who falsely claimed to be a United States citizen. On that occasion, Zamora admitted that he received $20 to transport the Mexican citizen across the border. Zamora was also arrested with Picazo on April 31, 2001, when the two of them attempted to transport Zamora's sister into the United States with a false claim to United States citizenship. On that alien smuggling occasion, Picazo and Zamora's three children accompanied them.

**C. Defendants' Interviews**

At 10:40 p.m., Agents Dinise and Bush advised Picazo of her Miranda rights, in a videotaped interview. Picazo stated that she understood her rights and was willing to answer the agents' questions. Both agents were wearing plain clothes, with no weapons visible. Picazo admitted that she was arrested twice in the past for alien smuggling.

Picazo said she was a United States citizen by birth and was married to Zamora. Zamora explained her activities on the date of her arrest, but claimed her family was just going to the Golden Acorn casino. When Agent Bush revealed his surveillance of the Navigator and the pickup truck in Pine Valley to Picazo, she said that Zamora was driving the truck from the casino due to mechanical trouble. When Picazo concluded that she would be better off speaking with a lawyer, Picazo clearly invoked her right to speak to a lawyer. All questioning ceased at that point, which was just after 11 p.m.

The next morning, Agent Cuevas provided Picazo with breakfast. Picazo said that she did not want to eat the food, but Agent Cuevas told Picazo that he would leave the breakfast with her, in case she changed her mind. While Agent Cuevas was performing a patdown search prior to transporting Picazo to the Metropolitan Correctional Center, Picazo indicated that she wanted to speak with agents about the statement that she gave the previous night.

At approximately 8:28 a.m., Agent Dinise and Agent Cuevas began an interview that was videotaped. Agent Dinise began the interview by asking Picazo if she remembered the Miranda rights that had been recited to her the night before. Picazo indicated that she recalled her rights, did not want to hear them again, and was willing to answer agents' questions. During the interview, Picazo sat on a bench, with her left hand secured by a long metal chain to the bench. Picazo admitted that she and Zamora agreed to participate in alien smuggling in return for $1,000. Picazo said the smugglers dropped off the pickup truck at her house in Chula Vista. Picazo explained that Zamora drove the pickup truck east on Interstate 8, followed by Picazo in the Navigator. The purpose of this Interstate 8 trip was to drop the pickup truck off in Pine Valley so that it could be used for alien smuggling. Picazo admitted that she knew that alien smuggling was illegal, but chose to accept the risk due to the financial benefits. The second interview concluded at approximately 8:46 a.m. When Picazo was sniffling at the start of the morning interview, the agent said he would need Picazo to calm down, and offered her water and Kleenex, along with some extra time to relax.

When agents read Zamora his Miranda rights, he invoked his right to remain silent. All questioning of him ceased.

Agents read Lopez-Martinez/Gobea-Lopez his Miranda rights; Lopez agreed to answer questions. Lopez initially claimed to be nothing more than a smuggled alien, who was free from any involvement as a smuggler. Later, Lopez admitted his involvement in the offense: essentially bringing in and transporting illegal aliens for financial gain. Lopez stated that he helped a man named Zorrillo cross ten undocumented aliens underneath the border fence. Lopez explained the circumstances of his involvement, which culminated in the crash of the pickup truck and running away from the vehicle while being pursued by Border Patrol agents.

Lopez said that Zorrillo got away while Lopez attracted the attention of the agents by running in the opposite direction alone.

**D. Material Witness' Interviews**

Three material witnesses were retained and interviewed: Marco Antonio Vieira-Portugal; Edilberto Santana-Bahena; and Yunuen Quesada-Velazquez. None of these witnesses was a United States citizen or had any right to enter the United States. The material witnesses were all planning to pay $2,000 to $3,000 to be smuggled illegally into the United States.

Vieira is a citizen of Peru who legally resides in Mexico pursuant to a treaty. He said that the group did not eat for more than one day, and were not prepared for the cold conditions it faced in the mountains at night. Vieira overheard one of the foot guides having a conversation on a Nextel speakerphone, arranging to meet at 8:00 p.m. over a bridge. After that conversation, Vieira saw a red sport utility vehicle ("SUV") and a pickup truck pulled up on the side of a bridge. Vieira saw the driver of the pickup truck get out and run into the red SUV. Both foot guides instructed the group to get into the bed of the pickup truck. Then, both foot guides climbed into the cabin of the truck. The truck took off at a high rate of speed in the freezing cold, with no protection for the group. The smuggler with whom Vieira made arrangements instructed him to give either foot guide $800 upon arrival in San Diego. Vieira had $720 in United States currency in his pocket to corroborate his story. From a photo lineup, Vieira identified Defendant 3, Alberto Lopez-Martinez/Carlos Gobea-Lopez, as one of the foot guides for his group. Vieira did not identify the photographs of Defendants 1 and 2: Esmeralda Picazo or Manuel Zamora-Flores.

Santana is a Mexican citizen who made arrangements over the telephone with "La Dona" to be smuggled illegally to Santa Ana for $2,000. Santana crossed the border near Tecate by crawling under the border fence with a group of ten people, including a foot guide. After crossing, the group walked for half and hour and were picked up in a green vehicle and driven to another mountain. At around 4:00 a.m., the group crossed Interstate 8 highway. The group waited all day on the side of a mountain. The foot guide told the illegal aliens that a grey pickup truck would get them. The smugglers failed to provide food or water for the two day

trip. At some point, two vehicles pulled up on the side of the road. The foot guide ran toward the vehicles, followed by the group of aliens. The women were told to get into the front cabin, and the men were told to get into the bed of the truck. Santana described the dangerous driving, and the subsequent crash. Santana identified Lopez-Martinez/Gobea-Lopez as one of the foot guides, but could not identify Picazo or Zamora.

Quesada is a Mexican citizen with no right to enter the United States. Quesada's account of his smuggling journey was similar to that of Vieira and Santana.

**E. Indictment**

On May 9, 2008, a federal grand jury indicted Picazo, Zamora-Flores and Lopez-Martinez/Gobea-Lopez of bringing in illegal aliens for financial gain and aiding and abetting, in violation of 8 U.S.C. § 1324 (a)(2)(B)(ii) and 18 U.S.C. § 2, as well as transporting aliens and aiding and abetting, , in violation of 8 U.S.C. § 1324 (a)(1)(A)(ii) and 18 U.S.C. § 2.

## II

## MOTION TO COMPEL SPECIFIC DISCOVERY AND PRESERVE EVIDENCE

**A. Discovery**

As of August 14, 2008, the Government has provided the defendants with 235 pages of discovery including the complaint and statement of facts, report of investigation, documentation regarding defendant Palmer and Moraira's prior alien smuggling apprehensions, and photographs of the vehicle and other evidence. In addition to the 235 pages of discovery, the United States has also provided seven DVDs to each defendant which contains all of their statements, as well as a copy of the statement provided by the material witness on the day that the defendants were arrested, dispatch tapes and photographs. Finally, electronic photographs were sent by email to defense counsel.

**B. Informants and Cooperating Witnesses**

At this time, the Government is unaware of a confidential source or informant involved in this case. The Government must generally disclose the identity of informants where (1) the informant is a material witness, or (2) the informant's testimony is crucial to the defense. Roviaro v. United States, 353 U.S. 53, 59 (1957). If there is a confidential informant involved

in this case, the Court may, in some circumstances, be required to conduct an in-chambers inspection to determine whether disclosure of the informant's identity is required under Roviaro. See United States v. Ramirez-Rangel, 103 F.3d 1501, 1508 (9th Cir. 1997). Should the Government become aware of an information or confidential source being involved in this case, we will make it known to the defendants.

**C. Attorney Voir Dire**

The United States also requests the opportunity to conduct attorney voir dire at trial.

**D. Preservation of Evidence**

With respect to the defendants' discovery motions, the Constitution requires the Government to preserve evidence "that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984). To require preservation by the Government, such evidence must (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) "be of such a nature that the Defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489; see also Cooper v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001). The Government will make every effort to preserve evidence it deems to be relevant and material to this case. Any failure to gather and preserve evidence, however, would not violate due process absent bad faith by the Government that results in actual prejudice to the Defendant. See Illinois v. Fisher, 540 U.S. 544 (2004) (per curiam); Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); United States v. Rivera-Relle, 322 F.3d 670 (9th Cir. 2003); Downs v. Hoyt, 232 F.3d 1031, 1037-38 (9th Cir. 2000).

**E. Impeachment Evidence**

The Government recognizes its obligation under Brady and Giglio to provide material evidence that could be used to impeach Government witnesses.

**F. Notice of Intent to Use Evidence**

At the time of trial, a final list of exhibits will be provided to all defense counsel. The trial memorandum will contain a preliminary list of exhibits and witnesses.

**G. Severance of Defendants**

This motion is premature, since Picazo has not filed an affidavit, as required by United States v. Vigil, 561 F.2d 1316 (9th Cir. 1977). Furthermore, at this early stage in the proceedings, it is difficult to determine whether the trial tactics of one defendant would prejudice any of the other defendants.

**H. PICAZO'S POST-MIRANDA STATEMENTS ARE ADMISSIBLE**

1. These Interviews Comply With Miranda

After her lawful arrest, Picazo was advised of her Miranda rights, said she understood them and willingly made statements. As such, her post-arrest statements are admissible pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). A review of the video reveals that Picazo appears alert, coherent and responsive during the course of both interviews.

When Picazo indicated that she wanted to give another statement the morning following her arrest, Agent Dinise clearly asked if Picazo remembered her rights, and if she wanted to hear them again. Picazo indicated that she still remembered her rights, and that she did not want the rights to be read to her again.

A statement made in response to custodial interrogation is admissible under Miranda v. Arizona, 384 U.S. 437 (1966) and 18 U.S.C. § 3501 if a preponderance of the evidence indicates that the statement was made after an advisement of rights, and was not elicited by improper coercion. Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda rights should be found in the "absence of police overreaching"; "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). Picazo has raised no facts that would lead this Court to conclude that her waiver was elicited by improper coercion. Instead, the videotape reveals that she was treated humanely, that the agents correctly responded to her questions, and that she voluntarily agreed to make a statement.

2. The Statements Were Voluntary

Although the totality of circumstances, including characteristics of the defendant and details of the interview, should be considered, improper coercive activity must occur for suppression of any statement. See id. (noting that "coercive police activity is a necessary

predicate to the finding that a confession is not 'voluntary'"); cf. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("Some of the factors taken into account have included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations omitted).

Picazo was 26 years old at the time of his arrest in this case, not a youthful naivete. She is a United States citizen by birth who speaks fluent English. She serves as a manager of a business. Picazo's decision to invoke her right to counsel at the end of the first interview demonstrates her comprehension of her rights and her ability to invoke them. Picazo's interviews were very short; the first lasted approximately 20 minutes, including the Lujan-Castro process and the Miranda advisement and the second lasted approximately 18 minutes. There was no use of physical punishment, and Picazo was loosely attached to the interview bench. The agents wore plain clothes and displayed no weapons. The agents spoke in normal tones and did not threaten Picazo. Under the totality of the circumstances, Picazo's statement was voluntary.

## I. THERE WAS NO FOURTH AMENDMENT VIOLATION

Picazo argues that the vehicle stop was an unreasonable search and seizure. The Government recognizes that the Fourth Amendment applies to all seizures, even brief detentions that fall short of a traditional arrest. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). For an investigatory stop, however, the requisite burden is less demanding than probable cause and allows an officer to search a vehicle based on the lower standard of reasonable suspicion. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989). As a result, officers may stop a vehicle for investigatory purposes if they can articulate facts that form a basis for a particularized suspicion of criminal activity. See United States v. Cortez, 449 U.S. 411, 417-18 (1981).

The requirement of a reasonable, or particularized, suspicion encompasses two elements. First, the suspicion must be based on the totality of the circumstances; and second, it

must arouse a suspicion that the particular person to be stopped has committed, or is about to commit, a crime. United States v. Arvizu, 534 U.S. 266, (2002); United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000). Although a reasonable suspicion can be aroused through a myriad of observations, insights, and actions, several generally accepted and widely factors have been enumerated.

Supreme Court precedent stresses the importance of recognizing that objective facts, when viewed by trained law enforcement officers - even if meaningless to the untrained observer or consistent with innocent travel - can be combined with permissible deductions from such facts to form a founded suspicion to stop a vehicle. Arvizu, 534 U.S. at 277 (holding that the Border Patrol agent was entitled to assess the situation in light of his specialized training and familiarity with the area); Cortez, 449 U.S. 419.

In Brignoni-Ponce, the Supreme Court set forth a non-exclusive list of factors upon which Border Patrol agents may rely in finding reasonable suspicion: (1) the characteristics of the area in which they encounter a vehicle; (2) the vehicle's proximity to the border; (3) usual patterns of traffic on the particular road; (4) information about previous illegal border crossings in the area; (5) whether certain vehicles are commonly used to transport contraband or aliens; (6) the driver's erratic behavior; (7) a heavily loaded vehicle or an unusual number of passengers. 422 U.S. at 884-85; see also, United States v. Olafson, 213 F.3d 435, 439 (9th Cir. 2000).

In this case, the area where all three defendants were arrested is mountainous and sparsely inhabited. The typical traffic pattern on a weeknight is very light. The Pine Valley area is notorious for alien smuggling. Both vehicles involved in the smuggling were traveling in highly suspicious manner very close to the border. The pickup truck and Navigator drove unusually close to one another, approximately one car length away in high speed traffic. The Navigator swerved into the path of a marked Border Patrol vehicle as the vehicle attempted to get close to the pickup truck. The vehicles were registered to the same family at an address in Chula Vista, a significant distance from Pine Valley. The driver of the pickup truck engaged in

erratic behavior when he drove approximately 90 miles per hour down a commercial single-lane street and crashed, leaving multiple illegal aliens to flee on foot.

A reasonable officer or agent working in this are would conclude that the tandem driving pattern and vehicle registrations, combined with the rest of the factors, give reasonable suspicion to believe that both vehicles were involved in the alien smuggling crime. Although Picazo argues that the agents only acted on a hunch, the observations clearly support reasonable suspicion to briefly detain the occupants of both vehicles to determine whether they were engaged in alien smuggling. The stop was justified; the Fourth Amendment was not violated. For the reasons mentioned above, the motion to suppress evidence due to an allegedly invalid detention should be denied.

## III

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

The Government does not object to the granting of leave to file further motions as long as the further motions are based on newly discovered evidence or discovery provided by the Government subsequent to the instant motion at issue.

## IV

## GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY

### (1) All Evidence That The Defendants Intend To Introduce In Their Cases-In-Chief

Since the Government will honor the defendants' requests for disclosure under Rule 16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1). Pursuant to Rule 16(b)(1), requests that the defendants permit the Government to inspect, copy and photograph any and all books, papers, documents, photographs, tangible objects, or make copies or portions thereof, which are within the possession, custody, or control of the defendants and which the defendants intend to introduce as evidence in his case-in-chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments

made in connection with this case, which are in the possession and control of the defendants, which they intend to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom the defendants intend to call as a witness. The Government also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the Government receives the reciprocal discovery to which it is entitled.

**(2) <u>Reciprocal Jencks – Statements By Defense Witnesses (Other Than The Defendants)</u>**

______Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires production of the prior statements of all witnesses, except a statement made by the defendants. The time frame established by Rule 26.2 requires the statements to be provided to the Government after the witness has testified. However, to expedite trial proceedings, the Government hereby requests that the defendants be ordered to provide all prior statements of defense witnesses by a reasonable date before trial to be set by the Court. Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

V

**CONCLUSION**

For the foregoing reasons, the Government requests that the Court deny the defendants' motions, except where unopposed, and grant the Government's motion for reciprocal discovery.

DATED: August 14, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

/s/ *Christina M. McCall*
CHRISTINA M. McCALL
Assistant United States Attorney
Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ESMERALDA PICAZO (1),<br>MANUEL ZAMORA-FLORES (2),<br>ALBERTO LOPEZ-MARTINEZ (3),<br>aka Carlos Gobea-Lopez<br>Defendants. | Criminal Case No. 08CR1193-DMS<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, Caroline P. Han, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of **RESPONSE AND OPPOSITION TO THE DEFENDANTS' MOTIONS** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Michael Crowley
Jeremy Warren
Barbara Donovan
*Attorneys for the defendants*

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2008

/s/ *Christina M. McCall*
CHRISTINA M. McCALL